**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SONY CORPORATION OF AMERICA, now
known as Sony Electronics, Inc.,
Plaintiff-Appellee,

v.

BANK ONE, WEST VIRGINIA,
HUNTINGTON NA, formerly known as

No. 94-2230

First Huntington National Bank,
N.A.,
Defendant-Appellant,

v.

THE STEREO FACTORY, INCORPORATED,
Defendant-Appellee.

SONY CORPORATION OF AMERICA, now
known as Sony Electronics, Inc.,
Plaintiff-Appellant,

v.

THE STEREO FACTORY, INCORPORATED;

No. 94-2334

BANK ONE, WEST VIRGINIA,
HUNTINGTON NA, formerly known as
First Huntington National Bank,
N.A.,
Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert J. Staker, Senior District Judge.
(CA-92-1099-3)

Argued: July 10, 1995

Decided: May 30, 1996

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

_____

Affirmed as modified by published opinion. Judge Russell wrote the majority opinion, in which Judge Hall joined. Judge Widener wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Daniel Joseph Konrad, HUDDLESTON, BOLEN, BEATTY, PORTER & COPEN, Huntington, West Virginia, for Appellant. Bonnie Irvin O'Neil, THOMPSON, HINE & FLORY, Columbus, Ohio, for Appellees. **ON BRIEF:** Thomas R. Allen, THOMPSON, HINE & FLORY, Columbus, Ohio; Richard M. Francis, BOWLES, RICE, MCDAVID, GRAFF & LOVE, Charleston, West Virginia, for Appellee Sony Corp.

_____

**OPINION**

RUSSELL, Circuit Judge:

This case involves a dispute between two secured creditors with competing claims to the proceeds from the sale of inventory. The main issue before this court is whether Sony Corporation of America ("Sony"), the holder of a purchase money secured interest in the inventory, had a first-priority claim in the proceeds even though the seller received payment for the inventory on the day after the delivery of the goods to the buyer. We must decide just how strictly we should read § 9-312 of the Uniform Commercial Code, which gives the holder of a purchase money secured interest in inventory "priority in identifiable cash proceeds received <u>on or before the delivery</u> of the inventory to a buyer . . . ." W. Va. Code § 46-9-312(3) (emphasis added). The district court concluded that Sony had a first priority

2

claim in the proceeds, notwithstanding the fact that payment was received on the day after the delivery of the goods. We agree.

This case also presents a second issue regarding the identifiability of cash proceeds that are deposited in the seller's checking account and comingled with other funds in that account. We must decide whether the district court could presume that the seller had transferred a portion of the proceeds to a savings account even though the seller had clearly earmarked those funds as having originated from another source. We conclude that the district court correctly determined that the funds transferred to the savings account constituted identifiable proceeds from the sale of the inventory. We therefore affirm the decision of the district court, although we make a slight modification to the judgment regarding the calculation of damages.

I.

Stereo Factory, Inc., one of the defendants, is a West Virginia corporation, primarily located in Huntington, West Virginia. On August 23, 1988, the First Huntington National Bank[1] (the "Bank"), the other defendant, loaned $200,000 to Stereo Factory. The loan was secured by a blanket security agreement granting the Bank a security interest in virtually all of Stereo Factory's personal property, including its inventory. On July 13, 1989, the Bank made a second loan in the amount of $550,000 and secured by a second security agreement. The Bank perfected its security interests by filing the appropriate financing statements with the proper authorities.

On August 16, 1990, Sony entered into a purchase money security agreement with Stereo Factory. Sony agreed to extend credit to Stereo Factory for the purchase of Sony merchandise. In return, Stereo Factory granted Sony a purchase money security interest in all goods and inventory sold to it by Sony, as well as the proceeds of those goods and inventory. Sony perfected its security interest and notified the holders of conflicting security interests, including the Bank, that Sony held a purchase money security interest in the inventory.

_____

[1] The First Huntington National Bank is now known as Bank One, West Virginia, Huntington NA.

On August 19, 1992, Stereo Factory submitted to Sony a purchase order for 1,150,000 audio cassette tapes at the price of $.55 per tape. Stereo Factory made a down payment of $160,000 on the following day. On August 21, 1992, Sony sent a shipment of 227,860 tapes to Stereo Factory for a total invoice price of $125,323. Upon receiving the shipment, Stereo Factory sent the tapes to H.K. Tronics, one of its customers. H.K. Tronics received the first shipment on August 27, and on that day paid for the shipment by a cashier's check in the amount of $120,765.80 payable to Stereo Factory. [2] On August 31, Stereo Factory deposited the check into a checking account that it maintained with the Bank.

Also on August 21, 1992, Sony sent a second shipment of 422,140 audio cassette tapes to Stereo Factory for a total invoice price of $232,177. Upon receiving the shipment, Stereo Factory immediately sent the tapes to Delinda Camera & Art Supply ("Delinda Camera"), another one of its customers. Delinda Camera received the shipment on August 24, and issued a check that same day for $221,655, payable to Stereo Factory. Delinda Camera gave the check to the driver of the truck that delivered the shipment. Stereo Factory deposited the check into its checking account on August 25.

In this case, we are most concerned with the third and final shipment of tapes. On August 31, 1992, Sony shipped the remaining 500,000 audio cassette tapes to Stereo Factory for the total invoice price of $275,000. Upon receiving the shipment, Stereo Factory immediately sent the tapes to Delinda Camera, which received the shipment on September 3. Delinda Camera had agreed to pay $262,500 for the shipment, subject to a $20,000 discount if it paid for the tapes in cash within three days of receipt. On September 4, Delinda Camera issued a check payable to Stereo Factory for $242,468.50.[3] Delinda Camera either gave the check directly to the

---

[2] The record does not explain why Stereo Factory was selling shipments of tapes at a loss. Cf. Joseph Heller, Catch-22 229 (New Laurel ed., Dell Publishing 1990) (1955) (chapter 22) (Milo Minderbinder explains how he can make a profit buying eggs at seven cents apiece and selling them for five cents).

[3] Delinda Camera deducted $31.50 from the price because the shipment was short by 60 tapes.

4

truck driver or mailed it to Stereo Factory by overnight mail. The Stereo Factory invoice documenting this transaction confirms a delivery date of September 3 and a payment date of September 4. Stereo Factory deposited the check into its checking account on September 8.

Although Stereo Factory received full payment from its customers for the three shipments of tapes, it did not make any payments to Sony except for the $160,000 down payment. After deducting various credits, Stereo Factory owes Sony a total of $468,720.51 for the three shipments.

While Stereo Factory was not paying its debt to Sony, on September 9, 1992, Stereo Factory sold its Parkersburg operation to T.D.S., Inc. ("T.D.S.") for $250,000. T.D.S. obtained a loan from the Bank, which issued a cashiers check to T.D.S. The cashiers check, No. 246208, contained the words "Loan proceeds." Upon receiving the cashiers check from T.D.S., Stereo Factory deposited it into its checking account. Also on September 9, Stereo Factory opened a savings account, which was pledged to the Bank to secure Stereo Factory's outstanding loans. In opening the savings account, Stereo Factory deposited a check in the amount of $78,266.64 drawn from its checking account. Stereo Factory indicated in two ways that it intended the $78,266.64 amount to come from the $250,000 it had just deposited into the Checking Account. First, the check issued by Stereo Factory contained the words "Loan Proceeds Receipt." Second, the savings account deposit slip contained the words "Proceed of Cashiers Check 246208."

Stereo Factory also maintained a sweep account with the Bank. The funds in this account were used to purchase part of the Bank's investment portfolio. This account was aptly named because Stereo Factory would periodically "sweep" funds from the checking account into the sweep account so that Stereo Factory could earn a return on those funds. On September 15, 1992, Stereo Factory transferred the entire balance of the checking account, $221,419.80, into the sweep account. Over the next few days, some of those funds were transferred back to the checking account to pay off various creditors. On September 17, when the Bank took action against Stereo Factory to collect on its outstanding loans, $123,912.94 remained in the sweep account.

5

Without giving Stereo Factory prior notice, the Bank set off $123,912.94 from the sweep account and $78,266.64 from the savings account, for a total of $202,179.58. The funds were applied toward the principal that Stereo Factory owed to the Bank. The Bank also liquidated additional collateral in order to further reduce Stereo Factory's indebtedness.

On December 2, 1992, Sony brought this action against Stereo Factory to recover on Stereo Factory's debt in the amount of $468,720.51, which represents the unpaid portion of the cost of the three shipments of tapes. On March 5, 1993, Sony added the Bank as a defendant and sought from the Bank the recovery of the $202,179.58 set off from Stereo Factory's bank accounts. Sony claimed that the moneys in Stereo Factory's bank accounts, which the Bank seized and converted, constituted identifiable proceeds of Sony's purchase money collateral, to which Sony had a first priority claim.

The parties jointly filed stipulations of fact, and no factual dispute having remained, Sony and the Bank filed cross-motions for summary judgment. On August 30, 1994, the district court granted summary judgment in favor of Sony against the Bank in the amount of $202,179.58. The district court also granted summary judgment in favor of Sony against Stereo Factory in the amount of $266,540.93, which constitutes the difference between the amount due to Sony from Stereo Factory and Sony's judgment from the Bank.

The Bank has appealed the decision of the district court. Sony has also filed a cross-appeal in which it argues that the district court should have entered a judgment against Stereo Factory in the amount of $468,720.51, instead of $266,540.93. For the reasons stated herein, we affirm the district court's granting of summary judgment in favor of Sony, but we modify the judgment against Stereo Factory as requested in Sony's cross-appeal.

II.

This Court reviews de novo the district court's granting or denying of summary judgment. Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 928 (4th Cir. 1995). Summary judg-

6

ment is appropriate where the record shows that"there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

This case turns on the interpretation of § 9-312(3) of the Uniform Commercial Code ("U.C.C."), which West Virginia has adopted. That section reads as follows:

> (3) A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds <u>received on or before the delivery of the inventory to a buyer</u> if:
>
> (a) The purchase money security interest is perfected at the time the debtor receives possession of the inventory; and
>
> (b) The purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party, or (ii) before the beginning of the twenty-one day period where the purchase money security interest is temporarily perfected without filing or possession (subsection (5) of section 9-304 [§ 46-9-304(5)]); and
>
> (c) The holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and
>
> (d) The notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.

W. Va. Code § 46-9-312(3) (emphasis added).

7

The issue in this case is whether the proceeds from the third shipment of tapes were delivered "on or before the delivery" of the goods. The parties have stipulated that the shipment was delivered on September 3, 1992, and that Delinda Camera's check in payment for the shipment was dated September 4, 1992. The check was either given directly to the truck driver who delivered the shipment or mailed to Stereo Factory by overnight mail.[4] The Bank argues that payment was not made "on or before the delivery" because Stereo Factory did not receive payment on the day of delivery.

This issue is critical because it determines which party has priority to the proceeds of the third shipment of tapes. If Stereo Factory received payment "on or before the delivery" of the third shipment of tapes, as Sony contends, then Sony has a first priority purchase money security interest in those proceeds under§ 46-9-312(3).[5] If Stereo Factory did not receive payment "on or before the delivery" and Sony therefore does not have a priority interest under § 46-9-312(3), then the Bank has a priority interest in the proceeds under § 46-9-312,(5)[6] which provides that the first party to file and perfect its secured interest takes priority.

_____

[4] The parties had difficulty establishing the exact events that transpired because they could not locate the truck driver who delivered the shipment.

[5] The district court found that Sony met the four enumerated requirements of § 46-9-312(3). The Bank does not challenge this finding on appeal.

[6] Section 46-9-312(5) reads as follows:

> (5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:
>
> (a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
>
> (b) So long as conflicting security interests are unperfected, the first to attach has priority.

The "on or before the delivery" language of§ 46-9-312(3) was meant to distinguish between cash proceeds and accounts proceeds. Comment 3 to § 46-9-312 reads as follows:

> When under these rules the purchase money secured party has priority over another secured party, the question arises whether this priority extends to the proceeds of the original collateral. . . . In the case of inventory collateral under sub-section (3), where it was expected that the goods would be sold and where financing frequently is based on the result-ing accounts, chattel paper, or other proceeds, the subsection gives an answer limited to the preservation of the purchase money priority only insofar as the proceeds are cash received on or before the delivery of the inventory to a buyer, <u>that is, without the creation of an intervening account to which conflicting rights might attach.</u>

W. Va. Code § 46-9-312 cmt. 3 (emphasis added). Where the sale of inventory results in an account, the rights of the purchase money secured creditor in the proceeds may conflict with the rights of other creditors who have security interests in the accounts. The drafters of the U.C.C. decided to protect accounts financers over inventory financers, and they limited the priority of purchase money secured creditors to the cash proceeds of inventory collateral. As comment 8 to § 46-9-312 explains:

> Many parties financing inventory are quite content to protect their first security interest in the inventory itself, realizing that when inventory is sold, someone else will be financing the accounts and the priority for inventory will not run for-ward to the accounts. Indeed, the cash supplied by the accounts financer will be used to pay the inventory financ-ing.

W. Va. Code § 46-9-312 cmt. 8. In using the"on or before the deliv-ery" language of § 46-9-312(3), the framers intended to differentiate between transactions in which the buyer paid in cash and transactions in which the buyer set up a credit arrangement and ended up owing the seller for the cost of the goods.

9

Delinda Camera did not purchase the third shipment of tapes from Stereo Factory on credit. Delinda Camera and Stereo Factory clearly contemplated a cash transaction, and Delinda Camera's payment for the shipment included a $20,000 discount for payment in cash. Furthermore, the fact that Delinda Camera issued its check on the day following the receipt of the third shipment of tapes does not imply that credit was extended to Delinda Camera. Given the realities of modern business, it is reasonable to expect a slight delay between the unloading of goods and the issuance of a check in payment for those goods. In a large company, it may take several hours--or even overnight--for the paperwork to travel from the receiving department, where the goods are unloaded, to the bookkeeping department, where the payment check is issued. Such a delay merely reflects the time it takes an organization to process its work; it does not indicate the extension of credit for that short period of time. Moreover, if a buyer receives a shipment of goods after its business office has closed for the day, it may pay for that shipment on the following morning simply because there was no chance to issue a check earlier.

We agree with the district court that, although the check was dated the day after delivery, Delinda Camera's payment for the third shipment of tapes was reasonably contemporaneous with the delivery of the goods and constituted payment "on delivery." We therefore reject the Bank's argument that Delinda Camera could have made payment "on delivery" only if it tendered its check to the truck driver or mailed its check to Stereo Factory on the same day that the shipment was delivered. We find that the Bank's position would lead to arbitrary results. Assume, for instance, that the truck driver arrived at Delinda Camera's premises at 9:00 a.m. on September 3, unloaded the third shipment of tapes, and drove off to his next destination. In this situation, it should make little difference whether Delinda Camera wrote and mailed its check at 5:00 p.m. on September 3 or at 9:00 a.m. on September 4; either check would have been written after the truck driver left the premises, but within a reasonable period of time to be considered contemporaneous with delivery under normal business practices. Under the Bank's rule, however, mailing the check at the close of business on September 3 would be considered payment on delivery, but mailing the check at the opening of business the following morning would be considered payment after delivery. We see no reason why we should adopt such an arbitrary distinction.

10

We note that Sony's and the Bank's dispute over the proceeds in question turns on the payment arrangements of Stereo Factory and Delinda Camera, neither of whom had a particular interest in whether payment was made "on or before the delivery" of the third shipment of tapes. In this situation, Sony could have done more to protect its purchase money secured interest in the inventory. In its contractual arrangement to supply Stereo Factory with tapes, it could have required Stereo Factory, when its sells its inventory, to receive payment in cash on or before delivery of the inventory. Sony did not include such a provision in its contract with Stereo Factory and, thus, conditioned its purchase money security interest in the proceeds on the actions of Stereo Factory and its customer. Although we hold that Delinda Camera's check dated the day following delivery constituted payment on delivery in this case, we would not have tolerated a longer delay. As the district court warned, "[e]very moment of delay between the delivery and the payment should be accounted for and the greater the delay, the more likely the purchase money secured party will be unable to avail itself of the protections of [W. Va. Code § 46-9-312(3)]." Sony Corp. of America v. The Stereo Factory, Inc., Civil Action No. 3:92-1099, am. mem. op. at 12 (S.D. W. Va. Sept. 2, 1994). Purchase money secured creditors would behoove themselves to require by contract that all payments for the sale of the purchase money inventory be received in cash on or before the delivery.

III.

We now turn to the question of whether the funds set off by the Bank from Stereo Factory's savings account are "identifiable" proceeds of the sale of the third shipment of tapes. See W. Va. Code § 46-9-312(3) ("A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer . . . ." (emphasis added)). The proceeds from the sale of the third shipment of tapes were placed in Stereo Factory's checking account on September 8, 1992, when Stereo Factory deposited Delinda Camera's check in the amount of $242,468.50. On September 17, 1992, the Bank set off $123,912.94 from Stereo Factory's checking account and $78,266.64 from its savings account. The Bank argues on appeal that the moneys

11

in the savings account are not identifiable cash proceeds from the sale of the third shipment of tapes.

In tracing and identifying proceeds under Article 9 of the U.C.C., courts have utilized the "lowest intermediate balance rule." E.g., C & H Farm Serv. Co. of Iowa v. Farmers Savings Bank, 449 N.W.2d 866 (Iowa 1989); General Motors Acceptance Corp. v. Norstar Bank, N.A., 532 N.Y.S.2d 685 (N.Y. Sup. Ct. 1988); Ex parte Alabama Mobile Homes, Inc., 468 So.2d 156 (Ala. 1987). This rule has been defined as follows:

> The rule, which operates on a common-sense view that dollars are fungible and cannot practically be earmarked in an account, provides a presumption that proceeds remain in the account as long as the account balance is equal to or greater than the amount of the proceeds deposited. The proceeds are "identified" by presuming that they remain in the account even if other funds are paid out of the account. . . . Under the rule, however, if the balance of the account dips below the amount of deposited proceeds, [the prior] security interest in the identifiable proceeds abates accordingly. This lower balance is not increased if, later, other funds of the debtor are deposited in the account . . . .

C.O. Funk & Sons, Inc. v. Sullivan Equipment, Inc., 431 N.E.2d 370, 372 (Ill. 1982). The lowest intermediate balance rule assumes that "the debtor spends his own money out of the account before he spends the funds encumbered by the security interest." Ex parte Alabama Mobile Homes, Inc., 468 So.2d 156, 160 (Ala. 1985). Furthermore, funds that are not spent but transferred to other accounts or used to purchase investments are identifiable as proceeds of the collateral. Central Production Credit Ass'n v. Hans , 545 N.E.2d 1063, 1072-74 (Ill. App. Ct. 1989) (funds in checking account were identifiable proceeds even though the funds had been used to purchase investments, which were then sold and redeposited into the checking account). Thus, the rule preserves the proceeds to the greatest extent possible as the account is depleted. C. O. Funk & Sons, 431 N.E.2d at 372.

12

On September 9, 1992, the day after Stereo Factory deposited the proceeds into the checking account, Stereo Factory transferred $78,266.64 from its checking account to its savings account. Before making this transfer, however, Stereo Factory deposited a check in the amount of $250,000 it had received from the sale of its Parkersburg operation. Stereo Factory indicated in several ways that it intended the $78,266.64 transferred to the savings account to come from the $250,000 it had just deposited into the checking account. First, the check issued by Stereo Factory and deposited into the savings account contained the words "Loan Proceeds Receipt," which referred to the $250,000 cashiers check.[7] Second, the savings account deposit slip contained the words "Proceed of Cashiers Check 246208." The Bank argues that, because Stereo Factory earmarked the $78,266.64 in the savings account to come from the $250,000 cashiers check, the funds in the savings account cannot be identified as proceeds from the sale of the third shipment.

We disagree. We state again that "dollars are fungible and cannot practically be earmarked in an account . . . ." C.O. Funk & Sons, 431 N.E.2d at 372. Once Stereo Factory deposited the $250,000 in its checking account, those funds were commingled with the other funds in the account and lost their identity as proceeds from the sale of the Parkersburg operation. Stereo Factory no longer had the ability to isolate a portion of that $250,000 and transfer those specific funds to its savings account. The words on the check and deposit slip merely provided useful notes for Stereo Factory's internal recordkeeping. Those notes, however, did not earmark the transferred funds and do not override the operation of the lowest intermediate balance rule.

Stereo Factory transferred $78,266.64 from its checking account to its savings account. The lowest intermediate balance rule allows a court to presume that those funds were identifiable cash proceeds from the sale of the third shipment of tapes.

_____

[7] The cashiers check in the amount of $250,000 constituted the proceeds of a loan from the Bank to T.D.S., which T.D.S. then used to purchase Stereo Factory's Parkersburg operation. The cashiers check itself contained the words "Loan Proceeds."

13

IV.

Finally, we turn to Sony's cross-appeal. Sony contends that the district court erred in granting a judgment against Stereo Factory in the amount of only $266,540.93. In determining this amount, the district court reduced the full amount that Stereo Factory owed to Sony ($468,720.51) by the amount of Sony's judgment against the Bank ($202,179.58). The Bank reasoned that a judgment of $468,720.51 against Stereo Factory and $202,179.58 against the Bank would create a windfall for Sony. Sony argues in its cross-appeal that the district court should have awarded Sony a judgment against Stereo Factory in the full amount owed, $468,720.51. We agree.

Sony has a judgment against the Bank in the amount of $202,179.58 because the Bank set off from Stereo Factory's accounts funds to which Sony had first priority. Despite the Bank's set-off and Sony's judgment against the Bank, the fact remains that Stereo Factory owes Sony $468,720.51. Sony is entitled to a judgment against Stereo Factory in that amount. Of course, the judgment against Stereo Factory should be reduced by the amount of any funds collected from the Bank. But, in the case that the Bank cannot pay its judgment in full, Sony has the right to seek from Stereo Factory the balance of its debt.

In all likelihood, the Bank will pay its judgment in full, and the judgment against Stereo Factory will be reduced to $266,540.93, the amount awarded by the district court. The Bank, after all, is the only defendant with the funds to pay its judgment, and Sony asserted its priority to the $202,179.58 set off by the Bank precisely because it knew that Stereo Factory does not have the funds to pay its judgment.

Nonetheless, correcting the judgment serves a purpose. It makes clear that Stereo Factory is ultimately liable for the full amount of its unpaid debt to Sony, and that any amounts paid by the Bank to Sony reduces the debt that Stereo Factory owes to Sony. Thus, the Bank has a right to indemnification from Stereo Factory for any amount it must pay to Sony because that money reduces Stereo Factory's debt to Sony. The district court, by reducing the judgment against Stereo Factory to $266,540.93, perhaps indicated that Stereo Factory was no longer obligated to pay the remaining $202,179.58 and that the Bank

14

would not be entitled to indemnification for that amount. We want there to be no confusion that the Bank can look to Stereo Factory for indemnification for any money that it must pay to Sony.

We conclude that the district court erred in awarding a judgment against Stereo Factory in the amount of $266,540.93. It should have awarded Sony a judgment against Stereo Factory in the amount of $468,720.51, subject to be reduced by any amounts collected from the Bank.

V.

For the foregoing reasons, we affirm the district court's granting of summary judgment in favor of Sony, and we modify the order to reflect a judgment against Stereo Factory in the amount of $468,720.51, subject to be reduced by any amounts collected from the Bank.

AFFIRMED AS MODIFIED

WIDENER, Circuit Judge, dissenting:

I respectfully dissent for two reasons, neither of which is more important than the other.

First, this case involves a question of state law that has not been answered by the West Virginia courts or in any other reported decision. As a matter of procedure and prudent deferment to the state courts, I believe this court should let West Virginia courts decide this novel question of state law. Second, having reached the merits of this case, I suggest that the majority misconstrues the facts of the case as well as the language of the applicable statute to achieve what can only be termed an incorrect result.

I.

This is a case of first impression, not only in the federal courts, but also in the courts of the fifty states. It is purely a question of state law. Especially for those reasons, I think the refusal of the majority to refer

15

the question decided to the Supreme Court of West Virginia is an abuse of discretion if it is possible to impose that standard in the situation presented here. Declining to accept the open invitation of the courts of a State to decide such a question of law, uniquely state, may even be said without undue exaggeration to border on a return to Swift v. Tyson, 16 Pet. (41 U.S.) 1 (1842); forgetting, along the way, the teaching of Erie that "whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law." Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

II.

This case is on appeal from an order on summary judgment. We review summary judgment orders de novo. Donmar Enters., Inc. v. Southern Nat'l Bank of North Carolina, 64 F.3d 944, 948 (4th Cir. 1995).

III.

Both the district court and the majority erred, I submit, in the principal premise of each of those decisions when each found that Delinda Camera did not purchase the third shipment of tapes on credit. The district court found:

> It [,Delinda Camera,] did not purchase the tapes in the Third Shipment on credit.

Mem. Op. & Order, at 10, Sept. 2, 1994. JA 144. The majority found:

> Delinda Camera did not purchase the third shipment of tapes from Stereo Factory on credit.

Slip. op. at 10. This mistaken statement of fact goes to the heart of the majority's opinion and I think it is plainly wrong. To understand the true nature of the transaction between Stereo Factory and Delinda Camera, we must look to the shipment invoice.[1]

_____

[1] The record does not contain a copy of the Purchase Order, if one even exists. The invoice is the sole written documentation we have of the transaction.

16

[A COPY OF THE SHIPMENT INVOICE IS INCLUDED
IN THIS SPACE IN THE PRINTED OPINION AND WILL
BE INCLUDED WHEN THE OPINION APPEARS IN THE
FEDERAL REPORTER]

17

Stereo Factory's invoice for the last shipment of tapes to Delinda Camera clearly shows that this was a charge transaction. See Stipulations of Fact, Ex. P, Sept. 22, 1993. JA 97. The transaction could have been C.O.D., cash, or charge, and it was charge. Under the section of the invoice titled "TERMS", the box next to"CHARGE" contained an X while the boxes next to "C.O.D." and"CASH" were not marked.

The invoice shows on its face that the tapes were delivered to Delinda Electronics on September 3, 1992.

"9-3-92, Delivered RC [apparently initials]
60 short 499,940 total"

The invoice also shows on its face payment on September 4, 1992.

"Paid
CK 38752
9-4-92"

The invoice also provides "Mr Ritz to send check within 3 days of receipt of goods for $20,000 cash discount."

Neither the opinion of the district court nor the opinion of the majority refers to the stated terms of the sale as shown by the invoice, much less explain them. The obvious, and only, explanation from the invoice is that the transaction was a credit transaction. That the invoice is that of the transaction at hand is agreed to by Stipulation of Fact, Exhibit P. "There would be no reason in having a stipulation of facts if parties were at liberty to ignore it . .. ." Judge Parker in Westinghouse Elec. Corp. v. Bulldog Electric Prod. Co., 179 F.2d 139, 141 (4th Cir. 1956). So the facts relied upon by the district court and the majority, by ignoring the invoice, are shown to be in error.

IV.

The district court and the majority rely on comment 3 to § 46-9-312, which recognizes the distinction between payment on delivery of inventory and payment after delivery, and distinguishes cash proceeds from accounts proceeds. And that comment, indeed, provides that § 312(3)

18

gives an answer limited to the preservation of the purchase money priority only insofar as the proceeds are cash received on or before the delivery of the inventory to a buyer, that is, without the creation of an intervening account to which conflicting rights might attach. W. Va. Code § 46-9-312 cmt. 3.

Even the majority opinion itself provides that "[w]here the sale of inventory results in an account, the rights of the purchase money secured creditor in the proceeds may conflict with the rights of other creditors who have security interests in the accounts." Slip op. at 9. The majority specifically recognizes that the Code treats cash transactions and credit transactions differently:

> In using the "on or before the delivery" language of § 46-9-312(3), the framers intended to differentiate between transactions in which the buyer paid in cash and transactions in which the buyer set up a credit arrangement and ended up owing the seller for the cost of the goods.

Slip op. at 9. Thus, while the majority acknowledges that a different result obtains if an account is created, it fails to acknowledge that an account is created when payment is received after delivery. The Code defines an account as "any right to payment for goods sold . . . which is not evidenced by an instrument or chattel paper." W. Va. Code § 46-9-106. If the seller receives payment on or before delivery, then the parties have not created an account, I submit. But, if the seller does not receive payment on or before delivery, then the parties have created an intervening account to which conflicting rights might attach.

In this case, the invoice and stipulations of fact show the creation of an intervening account. The failure to recognize this fact is the principal error in the majority opinion, which goes out of its way to attempt to justify its conclusion that this was a cash transaction.

But the factual underpinning of the justification fails.

The majority opinion provides that "Delinda Camera and Stereo Factory clearly contemplated a cash transaction." Slip op. at 10. The

19

invoice, however, provides that the transaction was"CHARGE." Indeed the boxes on the invoice for "C.O.D." and "CASH" are left blank. J.A. 97.

The majority opinion provides that ". . . payment for the shipment included a $20,000 discount for payment in cash." Slip op. at 10. The invoice, however, provides "Mr Ritz to send check within 3 days of receipt of goods for $20,000 cash discount." So the discount was not for cash only, as the majority opinion implies, but also for payment "within 3 days of receipt of goods," hardly the same. J.A. 97. The majority opinion provides that ". . . the fact that Delinda Camera issued its check on the day following the receipt of the third shipment of tapes does not imply that credit was extended to Delinda Camera." Slip op. at 10. The stipulations of fact, however, provide that "[o]n Sept. 3, 1992, Delinda received the Third Shipment. The next day, on September 4, 1992, Delinda issued a check payable to Stereo Factory . . . ." Stipulation 18, J.A. 49-50.

Thus, the check of Delinda Camera was not even issued until the day after delivery. During the period of time between the delivery of the goods and at least the issuance of the check, there is no other explanation but that credit was extended to Delinda Camera, and this is even verified by the invoice that it was a "CHARGE" transaction.

The majority opinion relies on what it calls "the realities of modern business," to wit:

> Given the realities of modern business it is reasonable to expect a slight delay between the unloading of goods and the issuance of a check in payment for those goods. In a large company, it may take several hours--or even overnight--for the paperwork to travel from the receiving department, where the goods are unloaded, to the bookkeeping department, where the payment check is issued.

Slip op. at 10.

This statement is subject to the same difficulty as are the critical parts of the factual foundation of the majority opinion I have mentioned above.

20

There is nothing in the record about the "realities of modern business."

There is nothing in the record about a "slight delay between the unloading of goods and the issuance of the check in payment of those goods."

There is nothing in the record about whether or not Delinda Camera is "a large company."

There is nothing in the record about whether, at Delinda Camera, it may take "several hours or even overnight for the paperwork to travel from the receiving department to the bookkeeping department."

There is nothing in the record about whether or not Delinda Camera has a receiving department.

There is nothing in the record about where the goods were unloaded, much less whether at a receiving department.

There is nothing in the record about whether or not Delinda Camera has a bookkeeping department.

There is nothing in the record about where the payment check was issued, at any bookkeeping department or elsewhere.

Shortcutting, such as that which the majority engages in here, is quite contrary to proof of custom of the trade, for I must assume that is what the majority seeks to rely upon in the above recitation of facts.

> Custom or Usage in Trade and Commerce. In evidencing a custom or usage . . . by a specific instance, the same general principle as before is applicable; that is, the instances offered (a) should be sufficiently numerous to indicate a fairly regular course of business and (b) should occur under conditions substantially similar to that in question. 2 Wigmore on Evidence § 379 (Chadbourne Revision 1979).

There is nothing in the record to show any regular course of business, or similar condition, or specific instance of any of the facts just

21

relied upon. Even if the majority has relied upon judicial notice for the facts just recited, which it has also not stated, that should not, and indeed cannot, be legitimately accomplished under Fed. R. Evid. 201, which provides, among other things, that for a court to take judicial notice of a fact it "must be one not subject to reasonable dispute" and either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

In the case before us, the facts recited by the majority fail on all three grounds. The facts may be disputed, they are not shown to be generally known within the territorial jurisdiction of the trial court, and they are not shown to be capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

Thus, the critical factual underpinnings of the majority opinion, I submit, have been shown to be without sufficient foundation.

V.

The cardinal principle of certainty has been the same in commercial law for more than 200 years. By any account, and common consent, Lord Mansfield, was principally, even if not wholly, responsible for the transposition of the law merchant into the common law from whence grew our commercial statutes and the Uniform Commercial Code, with which we are concerned here. He expressed the principle this way:

> In all mercantile transactions the greater objective should be certainty: and, therefore, it is of more consequence that a rule should be certain than whether the rule be established one way or the other. Vallejo v. Wheeler, 98 Eng. Rep. 1012, 1017 (K.B. 1774).

Mansfield repeated that statement in almost the same words in Buller v. Harrison, 98 Eng. Rep. 1243, 1244 (K.B. 1777). That the principle has not changed is shown by the very Code with which we

22

deal. The purpose of Article 9 of the UCC entitled SECURED TRANSACTIONS: SALES OF ACCOUNTS AND CHATTEL PAPERS is found in the official comment thereto, which provides that "[t]he aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and greater certainty." Official Comment to West Virginia Code, Ch. 46, Article 9, Vol. 13, p. 507 (1993).

In the face of such authority, early and late, the majority decides that payment which must have been made "on or before the delivery of the inventory to a buyer" under § 46-9-312(3) is made "on delivery" if it was made "reasonably contemporaneous with the delivery of the goods," slip op. at 10. And the opinion then holds that "Delinda Camera's check dated the day following delivery constituted payment on delivery in this case . . . ." Slip op. at 11.

Thus, I submit that the majority has not only failed to follow the statute involved in this case, as well as the facts, but, by defining "on or before the delivery" to mean "reasonably contemporaneous" it has substituted the uncertain words "reasonably contemporaneous" for the certain words "on or before," which have not been given other than a literal meaning so far as I have been able to ascertain.[2]

_____

[2] **E.g. Sheerer v. Manhattan Life Ins. Co.**, 20 F. 886, 888 (C.C.D. Ky. 1884) (on or before means at the instant of expiration or at any time in advance of that instant); Edward Knapp & Co. v. Tidewater Coal Co., 81 A. 1063, 1066 (Conn. 1912) (on or before excludes after); Council 81, Am. Fed'n of State, County, and Mun. Employees v. Delaware, 293 A.2d 567, 570 (Del. 1972) (on or before means not later than); Rhoads v. Myers, 245 N.W. 707, 710-11 (Iowa 1932) (on or before means at any time in advance of, to the exclusion of any time after); O.A. Talbott & Co. v. Byler, 217 S.W. 852, 853 (Mo. Ct. App. 1950) (on or before a certain date in a contract limits time of performance to that date); McCrory Stores Corp. v. Goldberg, 122 A. 113, 113 (N.J. 1923) (letter postmarked 7:30 p.m. October 31 does not satisfy requirement of notice on or before October 31 because not received on that date); Kauscher v. National Builders & Realtors, Inc., 92 N.E.2d 702, 703 (Ohio Ct. App. 1949) (on or before gives option of earlier delivery without obligation to do so); Edlund v. Bounds, 842 S.W.2d 719, 726 (Tex. Ct. App. 1992) (on or

In sum, I would reverse.

_____

before means immediately at or at any time in advance of the named period); Novosad v. Svrcek, 102 S.W.2d 393, 395 (Tex. 1937) (on or before in a contract or note means the maker has the option to pay before a fixed time and the paper does not mature until the expiration of that time); Lovenberg v. Henry, 140 S.W. 1079, 1080 (Tex. 1911) (on or before means immediately at or at any time in advance of).