**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4158

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DAVID HARRIS MILLER,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T.S. Ellis, III, Senior District Judge.  (1:17-cr-00213-TSE-1)

Argued:  October 31, 2018                     Decided:  December 20, 2018

Before KING, DUNCAN and WYNN, Circuit Judges.

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Judge King and Judge Wynn concurred.

**ARGUED:**  William Rakestraw Cowden, WILLIAM COWDEN LLC, Washington, D.C., for Appellant.  Gordon D. Kromberg, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** G. Zachary Terwilliger, United States Attorney, Uzo E. Asonye, Assistant United States Attorney, Samantha P. Bateman, Assistant United States Attorney, Karen Ledbetter Taylor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

DUNCAN, Circuit Judge:

Appellant David Harris Miller seeks interlocutory review of a pretrial order denying his motion to release seized assets. The government argues that these assets will be subject to forfeiture if he is convicted of pending criminal charges. Miller challenges the relationship between the seized assets and the criminal charges on which their forfeiture is predicated. Because the district court did not err in finding probable cause that the assets were "involved in" charged money laundering offenses and "traceable to" charged fraud and money laundering offenses, we affirm.

I.

Miller is charged with conspiring with his wife, Linda Wallis, to fraudulently procure and launder funds from three different organizations: SkyLink Air and Logistic Support, Inc. ("Skylink"), the Saslaw for State Senate campaign (the "Saslaw campaign"), and autism charity Community College Consortium on Autism and Intellectual Disabilities ("CCCAID") (collectively, the "victim organizations").

Miller served as general counsel and chief compliance officer at Skylink and was a co-founder of CCCAID. Wallis served as treasurer of the Saslaw campaign and executive director of CCCAID. As part of their alleged fraudulent scheme, Miller issued bills to SkyLink in the name of nonexistent law firms for work that was never done. Miller paid the bills from SkyLink's accounts, transferring funds to bank accounts that he and Wallis controlled. He and Wallis also transferred funds into these accounts from the accounts of the Saslaw campaign and CCCAID and transferred funds directly into their

2

personal accounts from CCCAID's accounts. Wallis pleaded guilty to conspiracy to commit wire fraud under 18 U.S.C. §§ 1343 & 1349 in 2015, before Miller was indicted. Neither the information charging Wallis nor her guilty plea included money laundering offenses.

As part of the case against Wallis, the government obtained a consent order providing for the forfeiture of Miller's real property in Fairfax, Virginia (the "Virginia property") and in Bethany Beach, Delaware (the "Delaware property") (collectively "the properties"). Wallis does not own either of the properties. Rather, it is undisputed that Miller purchased both properties before he married Wallis and before the charged conspiracy began.

Miller intervened in the ancillary forfeiture proceedings involving Wallis, contending that the properties were not subject to seizure because they did not belong to her. The district court then conducted several hearings to determine whether Wallis's convictions provided a basis for forfeiture of the properties. The district court has not yet resolved these proceedings.

At one of the hearings, FBI Forensic Accountant Stacy Young testified about the tracing analysis she used to connect the fraud proceeds to the properties. Young described Miller and Wallis's suspicious financial transactions involving fraudulently obtained proceeds and detailed their use of those proceeds to pay interest on a $650,000 balloon payment mortgage on the Virginia property and to pay for improvements on the Delaware property.

During those proceedings, Miller sold the Virginia property, and the equity proceeds from the sale were placed into a bank account under the control of the United States Marshals Service. The government has also placed a lis pendens on the Delaware property.

After the government placed these restraints on his assets, a grand jury indicted Miller on various counts of wire fraud, mail fraud, identity theft, and money laundering. Predicated on the fraud and money laundering charges, the indictment also includes civil and criminal forfeiture charges seeking forfeiture of the Delaware property and Miller's proceeds from the sale of the Virginia property.

In a *Farmer* hearing before the district court following his indictment, Miller challenged the restraint of these assets, which he claims he needs to retain counsel of his choice. *See United States v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001) (recognizing the right of criminal defendants to a hearing to challenge the pretrial seizure of allegedly forfeitable assets that the defendant needs to retain counsel). At the hearing, Young again testified that she had traced fraudulently obtained proceeds from the victim organizations through various bank accounts controlled by Miller and Wallis to the properties. Specifically, she traced fraud proceeds to Miller and Wallis's interest payments on the mortgage on the Virginia property. She also traced fraud proceeds to property tax payments for the Virginia property, and to payments made to repair and improve both properties. Young further noted that Wallis sent numerous emails regarding money laundering transactions from the properties, some from fake accounts.

The government sought to justify restraining the entire $313,550.82 in equity proceeds from the 2016 sale of the Virginia property by arguing that $286,559.83 in mortgage interest payments and a proportionate share of the Virginia property's equity appreciation, as well as approximately $30,000 in improvements and property tax payments, are traceable to fraud proceeds. These payments, the government argued, provide probable cause to find that Miller's equity proceeds from the sale of the Virginia property are forfeitable. The government also argued that $58,818.35 in fraud proceeds are traceable to expenditures on improvements to the Delaware property, establishing probable cause that the Delaware property is forfeitable. The district court agreed and affirmed the pretrial restraints.

This appeal followed.

## II.

Interlocutory orders restraining the assets of criminal defendants are procedurally equivalent to preliminary injunctions and thus subject to our review.[1] *United States v. Chamberlain*, 868 F.3d 290, 293 (4th Cir. 2017) (en banc). We review a district court's probable cause determinations de novo and its underlying factual determinations for clear

---

[1] The government argues that appellate jurisdiction is a "close" question "given the somewhat unique procedural history of this case." Appellee's Br. at 17. However, in *United States v. Chamberlain*, 868 F.3d 290, 293 (4th Cir. 2017) (en banc) we squarely held that a pretrial order restraining property subject to forfeiture was subject to interlocutory appeal under 28 U.S.C. § 1292(a)(1) as the procedural "equivalent to a preliminary injunction." Nothing about the case involving Wallis changes this analysis.

error.  *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011); *United States v. Herder*, 594 F.3d 352, 363 (4th Cir. 2010).

The government argues that the properties are subject to forfeiture under both 18 U.S.C. §§ 981 and 982.  Section 981 provides for the civil forfeiture of proceeds "traceable to" mail or wire fraud under 18 U.S.C. §§ 1341 or 1343.  Section 982 provides for the criminal forfeiture of property "involved in" money laundering transactions under either 18 U.S.C. § 1956 (involving transactions conducted for the purpose of concealment) or § 1957 (involving a "transaction in criminally derived property of a value greater than $10,000").  It also provides for the forfeiture of property "traceable to" any such property.  18 U.S.C. § 982.  Property involved in a money laundering offense is forfeitable in its entirety, even if legitimate funds have also been invested in the property. *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013).  Miller's indictment charges him with § 1341 mail fraud and § 1343 wire fraud as well as §§ 1956 and 1957 money laundering.

The government is entitled to seize assets subject to forfeiture pending a criminal trial even if a defendant needs those assets to retain counsel.  *United States v. Monsanto*, 491 U.S. 600, 615 (1989).  To seize such assets, the government must show probable cause to believe that the assets are forfeitable, *id.*, which requires showing that they have a "substantial connection" to the crime on which forfeiture is predicated.[2] *United States*

---

[2] This substantive assessment of the nexus between seized assets and underlying criminal charges does not turn on whether the government pursues civil or criminal forfeiture theories.  *See Herder*, 594 F.3d at 364.

6

*v. Leak*, 123 F.3d 787, 791–92 (4th Cir. 1997). A challenge to a pretrial seizure order does not permit us to second-guess a grand jury's finding that probable cause supports the charged offense.[3] *Kaley v. United States*, 571 U.S. 320, 333 (2014). We can, however, revisit a finding of probable cause that certain assets are subject to forfeiture. *Id.* at 324.

We first discuss whether probable cause supports a finding that the properties here were "involved in" the charged money laundering offenses, and then whether it supports a finding that fraud proceeds and laundered funds are "traceable to" these properties.

A.

We begin our analysis by determining whether probable cause supports a finding that the properties were "involved in" charged money laundering offenses. *See* 18 U.S.C. § 982. Although we have not expressly defined the requisite nexus for finding that real property is "involved in" money laundering transactions for purposes of forfeiture, the statute explicitly provides for the forfeiture of the actual proceeds of laundering transactions. These proceeds may include real property purchased with or improved by the expenditure of laundered funds. For instance, in *United States v. Marsh*, 105 F.3d 927, 932 (4th Cir. 1997), we upheld a district court's determination that a mall was

---

[3] Because we cannot second-guess a grand jury's finding of probable cause as to the charged offense, we do not consider Miller's argument that expenditures of any fraudulently-obtained funds on the properties were made without an intent to conceal and so could not constitute money laundering. Rather, we address whether, given the money laundering allegations in the indictment (which refers to the expenditure of fraud proceeds on home improvements, the movement of fraud proceeds through multiple bank accounts, and the expenditure of proceeds in excess of $10,000), probable cause exists to find that the properties were involved in those charged laundering transactions.

7

forfeitable as "involved in" money laundering where drug proceeds had paid for the initial purchase as well as associated construction and upkeep.[4]

Here, the district court correctly determined that the use of laundered funds to finance improvements to the Virginia and Delaware properties thereby converted the funds into an increase in the equity value of the properties. This determination was supported in detail by Young's analysis, which provides probable cause to find that the properties were "involved in" money laundering transactions because their value, at least in part, comprised the corpus of those transactions.

Although Miller places considerable weight on the fact that his properties were not *purchased* with laundered funds, the statutory test does not require so much. It requires only that property be "involved in" money laundering transactions. 18 U.S.C. § 982. Indeed, in *Marsh*, we emphasized both that the property "was purchased with proceeds of drug dealing" and that it was "involved in money laundering" as bases for forfeiture, and noted the use of laundered funds to pay for construction costs. 105 F.3d at 932 (citing *United States v. Real Property in Mecklenburg Cty, N.C., Known as Leola's Plaza,*

---

[4] This approach is in line with that of our sister circuits, which have construed the term "involved in" to encompass the corpus of a money laundering offense, as well as "any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Beltramea*, 849 F.3d 753, 758 (8th Cir. 2017) (citation omitted); *see United States v. Cessa*, 872 F.3d 267, 273–74 (5th Cir. 2017); *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003); *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998). Consistent with our approach in *Marsh*, the Eighth Circuit in *Beltramea* found that this "corpus" test provided for the forfeiture under § 982 of real property that laundered fraud proceeds were spent to improve. *See Beltramea*, 849 F.3d at 757.

*Located at 1501 W. Blvd.*, 814 F.Supp. 468, 473 (W.D.N.C. 1993) (resolving civil forfeiture proceeding concerning the same property)).

Miller also argues that the district court erred in assuming that any government interest in the equity value of his properties is equal to the amount of tainted money that he spent to improve them. Miller has not, however, suggested that the improvements to the properties that were paid for with fraudulently obtained or laundered proceeds were idiosyncratic or wasteful. In the absence of any such indication, the district court could properly find probable cause that Miller's expenditures on improving the properties did in fact improve them. Through that improvement, these properties became involved in money laundering. As we held in *Kivanc*, 714 F.3d at 794, a property involved in a money laundering offense is forfeitable in its entirety, so it is irrelevant whether the amount spent to improve the properties is equal to the resulting increases in their equity values.

Because probable cause supports a finding that Miller involved the properties in money laundering transactions by spending laundered funds to improve and retain them, we affirm the district court's determination that this is a proper a basis for their pre-trial restraint.

B.

Miller's equity in the Delaware property and the sale proceeds from the Virginia property are also forfeitable because they are "traceable to" laundered funds and funds obtained through fraud under § 981 for reasons similar to those discussed above.

9

Specifically, Young traced the expenditure of fraudulently obtained and laundered funds to improvements on the properties and a mortgage on the Virginia property.

Miller's contention that tainted funds are not traceable to these properties is predicated largely on two arguments: (1) that Young erred in her tracing analysis, on which the district court relied, and (2) that fraud proceeds used to pay interest but not principal on a mortgage are not traceable to equity in a property. Neither position is sound.

Significantly, Young did not err in her tracing analysis. Young utilized the lowest intermediate balance rule (the "LIBR"), a tracing rule set out in *Sony Corp. v. Bank One*, 85 F.3d 131, 138–39 (4th Cir. 1996) and *In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998). As described in *Sony*, the LIBR protects later-deposited innocent funds in an account in which tainted or secured funds were previously deposited and then depleted. 85 F.3d at 138–39. The LIBR provides that where the balance of an account into which tainted proceeds are deposited subsequently dips below the amount of those tainted proceeds, the only tainted funds thereafter traceable to the account are funds equal to that lowest account balance. This is true even if the account balance later grows through the deposit of legitimate funds. Assume, for example, that a money launderer deposits $50,000 of laundered proceeds into an account with a balance of $100,000, yielding a new balance of $150,000. The launderer then spends $120,000 and buys, inter alia, a $20,000 car, leaving the account with only a $30,000 balance. The LIBR precludes ascribing more than $30,000 in laundered proceeds to that bank account thereafter, even if the balance of the account subsequently rises above $50,000 through the deposit of

10

legitimate proceeds. However, it permits tracing $20,000 to the car that the money launderer purchased with tainted funds.

Miller seizes on language in *Sony* to argue that "a presumption that proceeds remain in the account as long as the account balance is equal to or greater than the amount of the proceeds deposited" entails a presumption that fraudulent proceeds are always spent last. 85 F.3d at 138 (citation omitted). According to Miller, only transactions that cause an account balance to dip below the amount of legitimate funds in the account permit tracing. *Sony*, however, does not support this contention. In *Sony*, we allowed a party with a security interest in certain funds to trace those funds through a transaction that took place before legitimate funds were depleted. *Id.* at 138–39. Specifically, Sony held a security interest in $242,468.50 that was deposited into a company's checking account. The company deposited an unrelated $250,000 sum to the same account and then transferred $78,266.64 from that checking account to a savings account. Notwithstanding the fact that the checking account balance at all relevant times was higher than the amount of the secured funds, we allowed Sony to trace its security interest to the $78,266.64 in the company's savings account. *Id.* In other words, the LIBR circumscribes what can be traced into an account, rather than out of it.

Here, Young's analysis correctly applied the LIBR and the district court properly relied on it to trace fraudulent proceeds to $286,559.83 in mortgage payments on the Virginia property. When added to traceable proceeds spent on improvements and property taxes, these traceable funds exceeded Miller's equity proceeds from the property's sale, supporting the restraint of the entire sum.

11

Miller's further argument that expenditures on mortgage interest payments are not traceable to equity in the property is not supported by authority. Payments on the mortgage directly increased Miller's equity in the Virginia property whether they went towards interest or principal on the note. The fraud proceeds were therefore "traceable to" Miller's equity interest as required by § 981.

III.

Because there is probable cause to find that Miller used fraudulently obtained and laundered funds to make mortgage payments and property tax payments associated with his Virginia property, and that he used funds to pay for improvements to both of his properties, probable cause exists to find that the properties are "involved in" and "traceable to" Miller's wire fraud and money laundering charges and are, therefore, forfeitable. The district court's order is therefore

*AFFIRMED.*

12