12-2383-cr
United States v. Walsh

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: March 18, 2013      Decided: April 2, 2013)

Docket No. 12-2383-cr

- - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

      Appellee,

    - v.-

STEPHEN WALSH,

      Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - -x

Before:        JACOBS, Chief Judge, CABRANES and WESLEY,
               Circuit Judges.

In this criminal case, Defendant Stephen Walsh appeals from an order of the United States District Court for the Southern District of New York (Cedarbaum, J.) denying his motion to release assets frozen in a parallel civil enforcement action.  Walsh, charged with fraud, seeks release of the proceeds from the sale of his house.  Walsh obtained the house from his wife in a divorce settlement in which his wife received (inter alia) a $12.5 million

distributive award, $6 million of which was paid using funds traceable to Walsh's fraud.  The district court properly applied the tracing analysis from United States v. Banco Cafetero Panama, 797 F.2d 1154 (2d Cir. 1986).  We affirm.

MARK A. FLESSNER, Holland & Knight LLP, Chicago, Illinois, for Defendant-Appellant.

JOHN J. O'DONNELL, (Iris Lan, on the brief), for Preet Bharara, United States Attorney for the Southern District of New York, for Appellee.

DENNIS JACOBS, Chief Judge:

Stephen Walsh, defendant in this criminal fraud case, appeals from an order of the United States District Court for the Southern District of New York (Cedarbaum, J.) denying his motion to release $3.7 million in assets that were frozen in a parallel civil enforcement action.  Walsh seeks to use those funds for his defense.  Walsh and his wife had purchased a house in her name using funds unrelated to the alleged fraud.  Pursuant to a divorce settlement, Walsh received title to the house and gave his wife (inter alia) a $12.5 million distributive award, at least $6 million of which was directly traceable to Walsh's alleged fraud.

After a hearing conducted pursuant to United States v. Monsanto, 924 F.2d 1186 (2d Cir. 1991) (in banc), the district court concluded that the $3.7 million at issue was "traceable" to the fraud. Walsh does not contest the underlying finding that there was probable cause to believe that Walsh committed the fraud. But he does challenge the finding that there was probable cause to believe that, after the divorce settlement, the house became traceable to the proceeds from the fraud.

He argues that the "tracing fiction" used by the district court is inapplicable to his situation. He also argues that the district court erred at the Monsanto hearing by admitting hearsay testimony from the FBI agent who investigated the fraud and by quashing Walsh's subpoenas.

For the following reasons, we affirm.

**I**

In 1983, the Walshes bought a house on Arden Lane in Sands Point for $900,000 and renovated it over the next several years at a cost of more than $2 million. In 1999, they sold the property in parcels for a total of $4.135 million. That same day, they applied most of the proceeds

3

to the $3.15 million purchase of another Sands Point house, on Half Moon Lane (the "Half Moon House" or the "House"). The title of the House remained in Walsh's wife's name alone until the divorce in 2006.

In November 2006, the Walshes entered into a Stipulation and Settlement and Agreement ("Divorce Agreement") that divided their assets and resolved all future claims for maintenance and/or an equitable distribution award. Walsh received title to the Half Moon House, as well as cars, certain bank accounts, and the business interests that were involved in the alleged fraud. His wife got condominiums in Florida and New York, cars, bank and securities accounts and life insurance policies, and a distributive award[1] of $12.5 million. At the time of Walsh's indictment, the only asset of substantial value he owned was the Half Moon House.

---

[1] Under New York law, a "distributive award" is a "payment[] provided for in a valid agreement between the parties . . . in lieu of or to supplement, facilitate or effectuate the division or distribution of property where authorized in a matrimonial action, and payable either in a lump sum or over a period of time in fixed amounts." N.Y. Dom. Rel. Law § 236(B)(1)(b).

Walsh made payments to his wife pursuant to the Divorce Agreement using the proceeds of the fraudulent scheme.[2]  The district court found that, all told, Walsh transferred at least $6 million of proceeds of the scheme to his wife, including the $3 million New York condominium acquired in her name prior to the divorce.

Walsh does not contest these findings on appeal.

**II**

On February 24, 2009, the government filed a criminal complaint against Walsh and codefendant Paul Greenwood alleging an investment fraud that began around 1996.  The next day, the CFTC and SEC filed civil actions  alleging the same conduct against Walsh, Greenwood, and their various entities.  That same day, Judge Daniels, who was presiding

---

[2]    In a related case, the New York Court of Appeals answered a certified question from this Court and determined that "where the innocent spouse and matrimonial court are unaware of the tainted nature of particular assets, distribution of marital assets under Domestic Relations Law § 236 . . . would become unworkable, particularly where the illegal activity of one spouse is not revealed for a number of years subsequent to the divorce, as occurred in this particular case." Comodity Futures Trading Comm'n v. Walsh, 927 N.Y.3d 162, 173-74 (2011).  Thus, although the proceeds of the fraud are clearly reachable as to Walsh's property, they are not as to that of his ex-wife.

5

over the civil case, granted the government's motion for a preliminary injunction seizing Walsh's assets.

Walsh and Greenwood were indicted on July 24, 2009, and Walsh pled not guilty a week later.

In December 2009, Walsh moved to unfreeze the Half Moon House to finance his defense in the criminal case. Judges Daniels and Cedarbaum jointly heard oral argument on the motion and ruled in February 2010 that Walsh was entitled to $900,000--the purchase price of the house on Arden Lane. The decision was without prejudice to Walsh's ability to seek additional funding.

In March 2011, the receiver sold the Half Moon House for approximately $3.7 million. Walsh thereafter moved to have the remaining portion of the sale price released to pay for his criminal defense. The parties agreed to hold a Monsanto hearing. The government advised the court that its only witness would be FBI Agent Barnacle, who had investigated the fraud.

Walsh subpoenaed two fact witnesses: his codefendant Greenwood, and Deborah Duffy, a partner at one of the entities involved in the fraud. Walsh also subpoenaed Brick Kane, the Chief Operating Officer of the court-appointed

receiver in charge of selling the Half Moon House.  The court granted the government's motion to quash all three subpoenas, on the ground "that the defendants seek . . . to hold a wholesale dress rehearsal of the trial by subpoenaing the principal cooperating witnesses of the government." Telephone Conference Tr. 2, Apr. 15, 2011.

At the <u>Monsanto</u> hearing, held over three days in May and June 2011.  Agent Barnacle recounted what Greenberg and Duffy told him about the fraudulent scheme and set out the transactional history of the Half Moon House.  The government introduced documents relating to the fraud and to the source of the assets.

Judge Cedarbaum denied the motion to unfreeze the remaining proceeds from the sale of the Half Moon House in May 2012, finding  probable cause to believe (1) that Walsh perpetrated the scheme, and (2) that the proceeds from the sale of the Half Moon House were traceable to the profits from the scheme.

**III**

"In order to seize property . . . , the government must demonstrate that there was probable cause to believe that

7

the property is subject to forfeiture." In re Seizure of All Funds in Accounts in Names Registry Pub. Inc., 68 F.3d 577, 580 (2d Cir. 1995). "The findings supporting a district court's determination as to probable cause are reviewed for clear error, but the determination itself is a conclusion of law reviewed de novo." Id.; accord United States v. Holder, 990 F.2d 1327, 1328 (D.C. Cir. 1993). Since Walsh does not contest any factual findings, but instead argues that the district court made an error of law in applying the tracing fictions from United States v. Banco Cafetero Panama, 797 F.2d 1154 (2d Cir. 1986), to this case, we review the district court's decision de novo.

Part of the Sixth Amendment's guarantee of the right to counsel is "the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). Nevertheless, a defendant may not use the proceeds of a fraud to fund his criminal defense: "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the

8

attorney of his choice." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626 (1989).

"[T]he [F]ifth and [S]ixth [A]mendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable." United States v. Monsanto, 924 F.2d 1186, 1203 (2d Cir. 1991) (in banc). The issue in this appeal is whether there was probable cause to believe that the proceeds from the sale of the Half Moon House were traceable to the proceeds of the fraud--i.e., that they were "another person's money."[3] Caplin, 491 U.S. at 626.

The Walshes purchased the Half Moon House with funds that were not traceable to the fraud, and the title was put in then-Mrs. Walsh's name alone. But Walsh ultimately acquired the house pursuant to the Divorce Agreement in exchange for, inter alia, a $12.5 million distributive

---

[3] We need not decide whether a Monsanto hearing is necessary in a case such as this where the government seized the assets in a parallel civil case, since we affirm the district court's decision within the Monsanto framework.

award, of which at least $6 million consisted of funds directly traceable to the fraud.

When some funds in a seized bank account are traceable to criminal activity and some are not, we consult Banco Cafetero, 797 F.2d 1154.  We have three "accounting choices" at our disposal to determine what amount of commingled funds are traceable to criminal activity.  Of relevance here is the "drugs-in, first-out" approach, which "consider[s] 'traceable proceeds' to be any one withdrawal, or any asset purchased with such withdrawal, to the extent of" the amount of the deposited tainted funds.  Id. at 1159.  Applying that approach, the district court analogized the sale proceeds of the Half Moon House "to a withdrawal from a commingled account, i.e., the marital estate."  United States v. Greenwood, 865 F. Supp. 2d 444, 450 (S.D.N.Y. 2012).

We conclude that the district court's application of Banco Cafetero was proper.  Walsh negotiated to get the Half Moon House and to keep his (now worthless) business interests in exchange for the $12.5 million distributive award.  Although the House itself is not a fungible asset, it was "an asset purchased with" the tainted funds from the marital estate, by operation of the Divorce Agreement.  See

10

*Banco Cafetero*, 797 F.2d at 1159.  Since Walsh's total assets did not exceed $6 million at the time of his arrest, under *Banco Cafetero*'s "drugs-in, first-out" approach, all of his assets are traceable to the fraud.

Walsh argues that he had a preexisting right to the Half Moon House under New York's 1980 Equitable Distribution Law and that he therefore did not "purchase" the House in the Divorce Agreement.  This argument ignores New York Domestic Relations Law section 236(B)(3), which allows parties to opt out of equitable distribution in favor of a negotiated settlement, which is what the Walshes did.  The analysis might differ if the marital estate had been distributed according to a court order under New York Domestic Relations Law section 236(B)(5).  We need not address that hypothetical, however, because Walsh freely negotiated title to the House in exchange for at least $6 million in funds traceable to the fraud.  Accordingly, the district court properly applied *Banco Cafetero*.

**IV**

Walsh argues that the district court made two related erroneous evidentiary rulings at the *Monsanto* hearing: (1)

11

admitting Agent Barnacle's hearsay testimony; and (2) quashing Walsh's subpoenas. For the reasons that follow, we reject both arguments.

**A**

The admissibility of hearsay at a <u>Monsanto</u> hearing is a question of law that we review <u>de novo</u>. <u>See generally</u> <u>United States v. Ferguson</u>, 676 F.3d 260, 285-86 (2d Cir. 2011) (reviewing hearsay decision <u>de novo</u>).

In order to "preclud[e] unwarranted exposure of government witnesses," <u>Monsanto</u> permits a "court [to] receive and consider at such a hearing evidence and information that would be inadmissible under the Federal Rules of Evidence." 924 F.2d at 1198, 1203. Although Walsh argues that <u>Monsanto</u>'s evidentiary rule should be limited to cases where witnesses may be in physical danger--such as those involving drugs[4]--we are persuaded by district court opinions in this Circuit applying <u>Monsanto</u>'s evidentiary

---

[4] <u>Monsanto</u> involved a seizure pursuant to 21 U.S.C. § 853(e)(3), a drug statute. There is no analogous statute in this case; the government froze Walsh's assets in the related civil case under the court's equity powers granted to it by Section 22(a) of the 1933 Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the 1934 Securities Exchange Act, 15 U.S.C. § 78aa. <u>See</u> <u>SEC v. Manor Nursing Ctrs., Inc.</u>, 458 F.2d 1082, 1103 (2d Cir. 1972).

12

rule to non-drug cases.  E.g., United States v. All Funds on Deposit in any Account at Certain Fin. Insts. Held in the Names of Certain Individuals, 767 F. Supp. 36, 42 (E.D.N.Y. 1991) (Spatt, J.); see also United States v. Clarkson Auto Elec., Inc., No. 10-CR-6111CJS, 2012 WL 345911, at *1 n.4 (W.D.N.Y. Feb. 1, 2012) (Payson, M.J.).  The unwarranted exposure of government witnesses was a valid consideration in this case, to avoid what the district court called a "dress rehearsal" of the trial.  In any event, the Monsanto hearing involved only a finding of probable cause, and "[a] finding of probable cause may be based on hearsay."  United States v. Daccarett, 6 F.3d 37, 56 (2d Cir. 1993).

**B**

We review the quashing of a subpoena for abuse of discretion.  See Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010).  The same consideration that justifies receipt of hearsay evidence in a Monsanto hearing (unwarranted exposure of witnesses) supports the district court's exercise of discretion to quash the subpoenas of two fact witnesses: Greenwood and Duffy.  Walsh argues that his right to an "adversary proceeding" should be weighed against

13

the government's interest in protecting its witnesses, and argues that his is the greater interest. But <u>Monsanto</u> has already decided, when the government has an interest in preventing the "unwarranted exposure" of its witnesses, that interest tends to outweigh a defendant's right to cross-examine those witnesses before the trial. <u>See</u> 924 F.2d at 1195-98.

The subpoena served on the receiver raises no risk of "unwarranted exposure of government witnesses," but in any event, the district court did not consider any hearsay evidence that was based on the receiver's analysis or conclusions. Rather, the district court based its decision entirely on the documentary evidence in the case--the same documents that were available to the receiver.[5] Walsh fails to show what he would have gained by calling the receiver.

---

[5] Walsh argues that the court *did* consider the receiver's conclusions by admitting Government Exhibit 603, which was a chart prepared by the receiver detailing payments Walsh made to his wife. As is clear from the hearing transcript, the government introduced this chart only "[f]or convenience and ease." Hr'g Tr. 134:13, May 24, 2011. The underlying records--upon which the receiver based the figures in the chart--were also admitted into evidence, and Agent Barnacle testified that he had reviewed those records and the chart and that the chart accurately reflected them. That the receiver created the chart is irrelevant because the chart did not reflect any independent analysis or computation on the receiver's part.

14

Accordingly, the district court did not abuse its discretion in quashing Walsh's subpoenas.

For the foregoing reasons, we affirm the order of the district court.