# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 14, 2024

Lyle W. Cayce
Clerk

———————

No. 23-20386

———————

In re Black Elk Energy Offshore Operations, LLC,

*Debtor*,

Richard Schmidt,

*Appellee*,

*versus*

Shlomo Rechnitz; Tamar Rechnitz,

*Appellants*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:19-AP-3370, 4:19-MC-33370

———————————————————————

Before Elrod, Duncan, and Ramirez, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

Mark Nordlicht defrauded the creditors of Black Elk Energy Offshore Operations ("Black Elk") of nearly $80 million. He then transferred those funds to his hedge fund's investors. Among the beneficiaries were Shlomo and Tamar Rechnitz, who received about $10.3 million. A federal jury later found Nordlicht guilty of securities fraud. *See United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021). Meanwhile, Black Elk declared bankruptcy, and

the Trustee initiated this adversary proceeding against the Rechnitzes. The bankruptcy court ruled the Trustee could recover the money they received from Nordlicht and the district court agreed. The Rechnitzes now appeal, contending that they received Black Elk's funds in good faith and that, in any event, their payout was not properly traced to Nordlicht's fraud.

We affirm.

## I. Background

### A.

Nordlicht was the founder and chief investment officer of Platinum Partners, a New York-based hedge fund. Platinum was the controlling shareholder in Black Elk, a Houston-based oil and gas company. Nordlicht and other Platinum leaders "often worked out of Black Elk's offices and participated in its management meetings." *Landesman*, 17 F.4th at 306. By late 2012, Black Elk was in financial straits, "plagued by rampant mismanagement and poor financial planning," including opulent spending by executives and employees. *Id.* at 304.[1] Intensifying the company's plight, in 2012 one of Black Elk's oil platforms in the Gulf of Mexico exploded. *Id.* at 308. After litigation ensued, regulators "shut down several of Black Elk's platforms, rendering them nonoperational and unable to produce revenue." *Ibid.*

Needing cash, in 2013 Black Elk issued Series E preferred equity shares. Platinum created a special-purpose entity—Platinum Partners Black Elk Opportunities Fund LLC ("PPBEO")—to purchase the shares and solicited its investors to participate. Among them were the Rechnitzes, who

---

[1] These expenditures included a Bourbon Street condo, strip club outings, a speedboat and "fleet of helicopters," and private flights featuring New Orleans Saints cheerleaders. *Id.* at 308.

since 2011 had invested millions with Platinum. Platinum offered them a 16 percent return on their PPBEO investment—more than double the usual seven percent return on Platinum funds—and promised to guarantee their principal.

Although Shlomo Rechnitz worried this opportunity might be "too good to be true," the Rechnitzes nonetheless invested $10 million in PPBEO. In PPBEO's subscription and LLC agreements, the Rechnitzes made PPBE Holdings (another Platinum entity) their agent. PPBE Holdings's managing member was Nordlicht.[2] Shlomo Rechnitz understood that PPBE Holdings and Nordlicht would be "handling and managing the [PPBEO] investment" for them.

Black Elk's demise continued and, by 2014, it was insolvent. Anticipating its collapse, Nordlicht devised a plan to pay PPBEO's investors rather than paying back Black Elk's substantial debts. Platinum installed a new Black Elk CFO, who sold Black Elk's best assets to Renaissance Offshore for $125 million. With the Renaissance proceeds, Platinum, through the new CFO, planned to redeem the Series E equity shares instead of paying Black Elk's senior secured bondholders or substantially overdue trade creditors. This strategy allowed Platinum to benefit through a priority position in Black Elk's anticipated bankruptcy. However, since the Renaissance proceeds would have gone to Black Elk's senior secured bondholders first, Platinum needed to subordinate the bonds to Series E equity shares. Doing so, however, required the consent of a majority of Black

---

[2] More specifically, in the LLC Agreement, the Rechnitzes "authorize[d] and appoint[ed]" PPBE Holdings/Nordlicht "as [their] true and lawful agent and attorney-in-fact, with full power of substitution and full power and discretionary authority to act in [PPBEO's] name, place and stead, to make [PPBEO's] investments and execute any trades ancillary to such investment."

Elk's disinterested bondholders, which was unlikely to happen. *See Landesman*, 17 F.4th at 322 (recounting testimony that voting for subordination as a disinterested bondholder "was not a rational choice" and "would have been 'kind of stupid'").

Nordlicht's solution was to rig the vote. He maneuvered various entities secretly controlled by Platinum into bondholder positions. He then shifted the PPBEO investment from Series E equity to bonds. As part of this scheme, Platinum convinced the Rechnitzes to roll their Series E equity investment into Black Elk bonds in exchange for a 20 percent return. The Platinum-controlled entities then posed as disinterested bondholders and voted for subordination. Buoyed by these fraudulent votes, the amendment passed.

With the bonds subordinated, Nordlicht's scheme could proceed. Once Black Elk received the Renaissance proceeds in August 2014, it sent $77,497,077 to Platinum to buy back the Series E shares from the Platinum entities then holding them. The Platinum entities then bought the Black Elk bonds held by PPBEO. This allowed PPBEO to pay its investors while simultaneously placing Platinum in a priority position in Black Elk's ensuing bankruptcy. *See Landesman*, 17 F.4th at 316–17. During this process, the Renaissance proceeds were transferred between various Platinum accounts and commingled with $7.2 million of untainted funds.

Nordlicht then began paying PPBEO's investors, including the Rechnitzes. In late August 2014, PPBEO sent the Rechnitzes a $267,149.80

interest payment. In early September, PPBEO wired the Rechnitzes their $10 million in principal.

In 2019, a New York federal jury found Nordlicht guilty of securities fraud. *See Landesman*, 17 F.4th at 317.

**B.**

Meanwhile, Black Elk declared bankruptcy. Its bankruptcy plan, which took effect July 25, 2016, established Liquidation and Litigation Trusts, administered by the Trustee and respective Trust committees. Since then, the Trustee has sought to recover the Renaissance funds Nordlicht transferred to PPBEO investors. In March 2019, the Trustee brought an adversary proceeding against the Rechnitzes.[3]

In December 2019, the Trustee moved to extend the dissolution deadline for both Trusts. Numerous parties, including the Rechnitzes, opposed the motion. They argued both Trusts dissolved by their own terms in July 2019, three years after the bankruptcy plan took effect.

The bankruptcy court disagreed, concluding the Trust Agreements' three-year time limit was "not self-executing" and required "[a]n act of dissolution," which had not occurred. Because the Trustee had not sought an extension within the time specified by the Trust Agreement, however, the court believed it could not grant the motion. To escape this "limbo," the court approved an amendment to the Trust Agreements extending the dissolution date.

The Rechnitzes appealed that decision to the district court, arguing both Trusts had dissolved in July 2019. That court dismissed their appeal,

---

[3] The approximately thirty other PPBEO investors who received Renaissance proceeds have settled the Trustee's claims against them.

concluding the Rechnitzes were not "aggrieved" by the extension and so lacked standing to appeal. The Rechnitzes did not appeal the district court's decision to our court.

With the Trusts extended, the Rechnitzes' adversary proceeding continued. The bankruptcy court granted the Trustee partial summary judgment in 2023. It ruled the Trustee could recover from the Rechnitzes under 11 U.S.C. §§ 544, 548(a)(1), and 550(a), which permit recission of fraudulent transfers of debtor property. The court rejected the Rechnitzes' argument that they were protected by 11 U.S.C. § 550(b)(1), which bars recovery from "good faith" transferees. The court ruled that, as the Rechnitzes' agent, Nordlicht's knowledge of the fraudulent scheme was imputed to them.

At a later hearing, the bankruptcy court ruled that the money PPBEO transferred to the Rechnitzes was traceable to the Renaissance sale. Although both parties submitted expert reports on tracing, the court found neither report "very helpful." Drawing on parts of the Rechnitzes' report, the court adopted its own tracing methodology and found the Rechnitzes' $10.3 million traceable to the fraud.

The bankruptcy court entered final judgment, and the Rechnitzes appealed. We granted the parties' joint petition for direct appeal to our court. *See* 28 U.S.C. § 158(d).

## II. Standard of Review

We review the grant of summary judgment *de novo*. *Smith v. H.D. Smith Wholesale Drug Co.* (*In re McCombs*), 659 F.3d 503, 507 (5th Cir. 2011). When issues "within the bankruptcy court's discretionary power" arise "in the context of a motion for summary judgment," we review them for an abuse of discretion. *I.G. Petrol. LLC v. Fenasci* (*In re W. Delta Oil Co., Inc.*), 66 F. App'x 524, 2003 WL 21016578, at *3 (5th Cir. 2003) (per curiam) (citing

*Neville v. Eufaula Bank & Tr. Co.* (*In re U.S. Golf Corp.*), 639 F.2d 1197, 1201 (5th Cir. 1981)).

## III. Discussion

The Rechnitzes press three issues on appeal. First, they argue the case is moot because the Trusts dissolved in 2019. Second, they contend that, under 11 U.S.C. § 550(b)(1), Nordlicht's knowledge of the fraud should not be imputed to them to defeat their status as good faith transferees. Finally, they argue the bankruptcy court's tracing analysis was flawed.

We consider each issue in turn.

### A. Trust Dissolution

The Rechnitzes contend the Trusts dissolved on their own terms in 2019, mooting this case. Recall that, in 2020, the bankruptcy court rejected this argument and extended the Trusts, and, in 2021, the district court dismissed the Rechnitzes' appeal of that order for lack of standing. They did not seek review in our court. Now, years later, they renew this argument.

The Rechnitzes concede they lacked standing in 2021 to appeal the bankruptcy court's extension orders. That is a wise concession. Standing to appeal a bankruptcy order is narrower than Article III standing. *Furlough v. Cage* (*In re Technicool Sys., Inc.*), 896 F.3d 382, 385 (5th Cir. 2018). Under the "person aggrieved" test, only persons "directly, adversely, and financially impacted by a bankruptcy order may appeal it," *id.* at 384, and their standing "must be connected to the *exact order* being appealed." *Dean v. Seidel* (*In re Dean*), 18 F.4th 842, 844 (5th Cir. 2021) (emphasis added). This rule is meant to keep bankruptcy proceedings from spawning "endless appeals brought by a myriad of parties who are indirectly affected by every

bankruptcy court order." *United States v. Krause* (*In re Krause*), 637 F.3d 1160, 1168 (10th Cir. 2011) (Gorsuch, J.) (quotation omitted).[4]

Merely because the extension orders permitted the Trustee to pursue a claim against the Rechnitzes does not mean the orders directly harmed them. "[A] bankruptcy order court allowing litigation to proceed against an adversary defendant does not make that defendant a party aggrieved." *Wigley v. Wigley* (*In re Wigley*), 886 F.3d 681, 685 (8th Cir. 2018) (citation omitted). That is "because an order subjecting a party to litigation, or the risk thereof, causes only *indirect* harm to the asserted interest of avoiding liability." *Atkinson v. Ernie Haire Ford, Inc.* (*In re Ernie Haire Ford, Inc.*), 764 F.3d 1321, 1325–26 (11th Cir. 2014) (collecting cases); *see also Moran v. LTV Steel Co.* (*In re LTV Steel Co.*), 560 F.3d 449, 453 (6th Cir. 2009) ("[W]e are aware of no court that has held that the burden of defending a lawsuit, however onerous or unpleasant, is the sort of direct and immediate harm that makes a party 'aggrieved' so as to confer standing in a bankruptcy appeal."). That is why the district court previously dismissed the Rechnitzes' appeal for lack of standing, which the Rechnitzes agree was correct.

Despite that, the Rechnitzes argue they *now* have standing to challenge the Trust extensions. That is because, they contend, they were

---

[4] Courts, including ours, have suggested that person aggrieved standing "may be incompatible with the Supreme Court's decision in *Lexmark*, which cast doubt on the role of prudential standing rules in federal courts." *Adams v. Roman Cath. Church of Archdiocese of New Orleans* (*In re Roman Cath. Church of Archdiocese of New Orleans*), 101 F.4th 400, 408 (5th Cir. 2024) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)); *see also Schier v. Nathan* (*In re Cap. Contracting Co.*), 924 F.3d 890, 894–97 (6th Cir. 2019); *Arlington Cap., LLC v. Bainton McCarthy LLC* (*In re GT Automation Grp., Inc.*), 828 F.3d 602, 605 n.1 (7th Cir. 2016). But the Rechnitzes do not raise that argument. Nor do they claim to have suffered an Article III injury from the extension orders. *See In re Archdiocese of New Orleans*, 101 F.4th at 408–10 (dismissing appeal based on failure to show Article III injury from bankruptcy court order); *In re Cap. Contracting Co.*, 924 F.3d at 897–99 (same); *In re GT Automation Grp., Inc.*, 828 F.3d at 604–06 (same).

directly harmed by the bankruptcy court's subsequent judgment in the adversary proceeding. As a result, they claim they can now contest that judgment on the ground that the Trusts had dissolved. We disagree.

The Rechnitzes cite no authority permitting them to bring this collateral attack on the extension orders. By the logic of their argument, as the Trustee observes, the Rechnitzes could also now contest, for instance, his own appointment or the plan confirmation itself. After all, like the Trust extensions, both events were prerequisites to the adversary proceeding. Such past-expiration-date challenges to any order that "indirectly affected" debtors would sow chaos, undermining every proceeding within the bankruptcy by making it re-examinable on appeal. *See Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 38 (2020) ("A bankruptcy case encompasses numerous individual controversies, many of which would exist as stand-alone lawsuits but for the bankrupt status of the debtor." (quotation omitted)).

Nor do the Rechnitzes explain how their approach comports with the "narrow" limitations of person aggrieved standing. *In re Technicool Sys., Inc.*, 896 F.3d at 385. To the contrary, they admit the extension orders *themselves* did not directly harm them. *See In re Dean*, 18 F.4th at 844 (person aggrieved standing must be linked to the "exact order"). That ends the matter. *See Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015) (holding "putative appellant shoulders the burden" of showing he is a "person aggrieved").

Accordingly, the Rechnitzes lack standing to challenge the Trust extensions.[5]

_____

[5] Even if the Rechnitzes had standing, there are serious questions about our jurisdiction to review the extension orders at this late date. The Trustee argues they were

No. 23-20386

## B. Good Faith and Agency Principles

Turning to the merits, the first issue we address is whether the bankruptcy court correctly ruled that the Rechnitzes were not good faith transferees of the $10.3 million and that the Trustee could therefore recover the funds from them.

A bankruptcy trustee may "avoid," or unwind, certain transfers of debtor property and "recover" that property from "any immediate or mediate transferee." 11 U.S.C. § 550(a)(2); *see, e.g.*, *id.* § 548(a)(1)(A) (trustee may undo transfers made to "hinder, delay, or defraud" creditors). But the trustee may not recover from a transferee who "takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided." *Id.* § 550(b)(1).

The Rechnitzes agree that Nordlicht's fraud renders Black Elk's transfer of the Renaissance proceeds to Platinum avoidable. They argue, however, that they were good faith transferees under § 550(b)(1) because that provision does not allow Nordlicht's knowledge (as agent) to be imputed to them (as principal). But, even if it does, they argue that Nordlicht acted outside the scope of his agency and that, as a result, they should not be charged with knowledge of his fraudulent activities.

---

final orders, meaning the Rechnitzes long ago missed the appellate deadline. *See Ritzen*, 589 U.S. at 37 (unlike in "civil litigation generally," orders disposing of "discrete disputes within the overarching bankruptcy case" are considered "'final[]' for purposes of appeal" (citation omitted)); Fed. R. App. P. 4(a)(1)(A) (notice of appeal must be filed within 30 days of challenged order). Indeed, when they appealed the orders to the district court, the Rechnitzes *themselves* argued they were final and thus appealable as of right. Now they have changed tune, claiming the orders were interlocutory and, in any event, lack preclusive effect because they had no standing to appeal them. Because we conclude that the Rechnitzes *still* lack standing to appeal the extension orders, we need not address this issue.

**1.**

The Rechnitzes argue that, to defeat their invocation of § 550(b)(1), the Trustee had to prove they *personally* knew about Nordlicht's wrongdoing. This is shown, they say, by the provision's use of the word "knowledge" and its failure to mention imputed or constructive knowledge. Accordingly, they contend that any knowledge derived from their agent, Nordlicht, is irrelevant to § 550(b)(1). We disagree.

To begin with, the Rechnitzes overlook the role of agency principles underlying the bankruptcy code. The code provisions on avoidance and recovery incorporate the law of fraudulent conveyances. *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 187 (2d Cir. 2021) (explaining "Sections 548 and 550 of the Bankruptcy Code, which deal with the trustee's ability to avoid and recover fraudulent transfers, . . . derive from the law of fraudulent conveyances" (citing 5 COLLIER ON BANKRUPTCY ¶ 548.01 (16th ed. 2021))); *see also Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 361–62 (2016) (explaining a fraudulent conveyance is a species of common law fraud for which transferees are liable). Under those common law antecedents, principals are "traditionally . . . liable for the frauds of their agents." *Bartenwerfer v. Buckley*, 598 U.S. 69, 76 (2023).[6]

This traditional linkage between principal and agent is not severed by Section 550(b)(1)'s mere use of the term "knowledge." To the contrary, "Congress legislates against [the] background of [such] common-law

---

[6] *See also, e.g.*, *Hart v. Sandy*, 20 S.E. 665, 668 (W.Va. 1894) (holding the principal was not a good faith transferee and was therefore liable for fraudulent conveyance based on inquiry notice imputed from agent); *Greenleve, Block & Co. v. L. & H. Blum*, 59 Tex. 124, 127 (1883) (same); *Lund v. Equitable Life Assurance Soc'y of the United States*, 31 N.J. Eq. 355, 362 (1879) (same).

adjudicatory principles, and it expects those principles to apply except when a statutory purpose to the contrary is evident." *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 572 (2021) (cleaned up) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)); *see also* Scalia & Garner, Reading Law: The Interpretation of Legal Texts 318 (2012) ("A statute will be construed to alter the common law only when that disposition is clear."). And "[i]t is a basic tenet of the law of agency that the knowledge of an agent . . . is imputed to the principal." *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320, 325 (5th Cir. 1993) (quoting *Mallis v. Bankers Tr. Co.* (*Mallis II*), 717 F.2d 683, 689 n.9 (2d Cir. 1983)).[7]

The Rechnitzes offer no reason to think that Congress enacted § 550(b)(1) in derogation of this common law principle. *Cf. Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) (because bankruptcy code was not written "on a clean slate," courts should hesitate to read it as "effect[ing] a major change in pre-Code practice"). Indeed, they concede § 550(b)(1) necessarily considers knowledge imputed from an agent when the principal is a *corporation*, given that corporations must act through agents. Individual principals, they insist, should be treated differently. They cite no authority to support this distinction. Nor do they explain why Congress would have wanted, in § 550(b)(1), to discard the "elementary doctrine" that a principal generally cannot "retain the benefit" of his agent's fraud. *Am. Sur. Co. of*

---

[7] *See also* Restatement (Second) of Agency § 272 (1958) (explaining "the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information"); *ibid.* cmt. a ("The principal is affected by the agent's knowledge whenever the knowledge is of importance in the act which the agent is authorized to perform. The knowledge may be of importance where . . . an agent acquires property for the principal."); Restatement (Third) of Agency § 5.03, cmt. b (2006) (the common law treats the agent's knowledge as his principal's knowledge, charging the principal "with the legal consequences of having [that knowledge]").

*N.Y. v. Pauly*, 170 U.S. 133, 152 (1898); *see also, e.g.*, *Bankers Life Ins. Co. of Neb. v. Scurlock Oil Co.*, 447 F.2d 997, 1006 (5th Cir. 1971) ("Principals should not be able to turn frauds and cheats loose on the public and expect to be immune from the consequences[.]"); Restatement (Third) of Agency § 5.03 cmt. b ("Imputation . . . reduces the risk that a principal may deploy agents as a shield against the legal consequences of facts the principal would prefer not to know.").

The Rechnitzes point to the fact that courts have interpreted § 550(b)(1) (and its close relative § 548(c)) to embody an "inquiry notice" standard, under which transferees must have actual awareness of suspicious facts. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th at 189–90 (collecting cases); *Templeton v. O'Cheskey* (*In re Am. Hous. Found.*), 785 F.3d 143, 164 (5th Cir. 2015) (§ 548(c) requires "inquiry notice"); *see also, e.g.*, *Grede v. Bank of N.Y. Mellon Corp.* (*In re Sentinel Mgmt. Grp., Inc.*), 809 F.3d 958, 961 (7th Cir. 2016) (inquiry notice "signifies awareness of suspicious facts that would have led a reasonable [transferee], acting diligently, to investigate further and by doing so discover wrongdoing."). But this does not help their argument. As a general matter, "the knowledge imputed to the principal [from an agent] is considered actual knowledge, not constructive." *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 n.4 (4th Cir. 1995) (citation omitted); *see also Buchanan v. Reliance Ins. Co.* (*In re Color Tile Inc.*), 475 F.3d 508, 513 (3d Cir. 2007) (same). Accordingly, "[i]f an agent has actual knowledge of a fact, the principal is charged with the legal consequences of having actual knowledge of the fact." Restatement (Third) of Agency § 5.03 cmt. b. That is why cases—concerning both

fraudulent conveyance and bankruptcy—routinely treat principal-transferees as being on inquiry notice based on their agents' knowledge.[8]

In sum, we reject the Rechnitzes' argument that, under 11 U.S.C. § 550(b)(1), a transferee's good faith cannot be defeated by knowledge imputed from the transferee's agent.

**2.**

Alternatively, the Rechnitzes argue that Nordlicht's fraudulent knowledge cannot be imputed to them because his actions fell outside the scope of his authority as their agent. We again disagree.

"[T]he knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal." *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *15 (Del. Ch. May 16, 2012) (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005)).[9] This rule applies "even [to] criminal acts," provided they are "foreseeable considering the [agent's] duties." *Williams v. United States*, 71 F.3d 502, 506 n.10 (5th Cir. 1995)

---

[8] *See supra* note 6; *see also Field v. Decoite* (*In re Maui Indus. Loan & Fin. Co., Inc.*), 2013 WL 2897792, at *8 (D. Haw. June 13, 2013) (rejecting "suggestion that imputed knowledge is a concept wholly distinct from either actual knowledge or inquiry notice—when knowledge is imputed, it is as if the principal itself is aware of such facts"); *Janvey v. GMAG, LLC*, 592 S.W.3d 125, 131 (Tex. 2019) (holding the principal was on "inquiry notice" of fraud based on "actual knowledge" imputed from agent); *Diaz-Barba v. Kismet Acquisition, LLC*, 2010 WL 2079738, at *19 (S.D. Cal. May 20, 2010) (same); *Smith v. Garcia Suarez* (*In re IFS Fin. Corp.*), 417 B.R. 419, 444 (Bankr. S.D. Tex. 2009) (same); *Wolkowitz v. Beverly* (*In re Beverly*), 374 B.R. 221, 239 (B.A.P. 9th Cir. 2007) (same).

[9] *See also La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984). While Delaware law governs the contracts conferring agency authority on Nordlicht, the parties agree that, as relevant here, Delaware and Texas agency law are not meaningfully different. So, like the parties and the bankruptcy court, we refer to authorities from both jurisdictions.

(applying Texas law); *see also G.T. Mgmt., Inc. v. Gonzalez*, 106 S.W.3d 880, 884 (Tex. App.—Dallas 2003, no pet.) (holding the agent's unlawful conduct is within scope of authority if it "is of the same general nature as that authorized or incidental to the conduct authorized"). Based on these principles, the Rechnitzes argue that Nordlicht's knowledge of his illicit scheme[10] cannot be imputed to them because he acted "far outside" the scope of his authority. We disagree.

In the LLC Agreement, the Rechnitzes gave Nordlicht "full power and discretionary authority to act in [PPBEO]'s name, place and stead, to make [PPBEO's] investments and execute any trades ancillary to such investments." As Shlomo Rechnitz understood it, this charged Nordlicht with "handling and managing" their PPBEO investment. Nordlicht's actions were all directly related to that authority. As part of the vote-rigging process, Nordlicht shifted PPBEO's and the Rechnitzes' own investment from Black Elk equity to debt. Acting in PPBEO's "name, place, and stead," Nordlicht voted its bonds in favor of subordination. And Nordlicht then had PPBEO sell its bonds in exchange for Renaissance Sale proceeds before distributing those proceeds to PPBEO's investors. Considering the broad scope of Nordlicht's authority, each of these misdeeds was "foreseeable."[11]

_____

[10] At oral argument, the Trustee suggested that Nordlicht's mere knowledge of Black Elk's dire financial condition would have been enough to place the Rechnitzes on inquiry notice of the transfer's voidability. We do not address that question because, in their briefs, the parties both presented the issue in terms of Nordlicht's knowledge of the criminal scheme.

[11] Additionally, the existence of an agency relationship is normally a fact question. *Fisher v. Townsends, Inc.*, 695 A.2d 53, 61 (Del. 1997); *see Ross v. Tex. One P'ship*, 796 S.W.2d 206, 209 (Tex. App.—Dallas 1990, writ denied) ("An agency relationship cannot be presumed to exist."). The Rechnitzes failed to carry their summary judgment burden to demonstrate a genuine issue of material fact—they did not advance summary judgment evidence demonstrating why an agency relationship is absent.

*See, e.g.*, *Williams*, 71 F.3d at 506–07 (because congressman's duties included publicly speaking about issues, his allegedly defamatory remarks while doing so were foreseeable and within scope of authority); *Wise v. W. Union Tel. Co.*, 178 A. 640, 644 (Del. Super. Ct. 1935) (deeming agent's forgery of telegram within scope of his authority to deliver telegrams).

The Rechnitzes seek refuge in two cases where a principal was found not liable for an agent's criminal acts. But those cases, unlike this one, involved radical detours from the agent's duties. The first, *Adami v. Dobie*, addressed an individual who was the principal's agent for ensuring the gates to a ranch were closed. 440 S.W.2d 330, 334 (Tex. App.—San Antonio 1969, *writ dism'd*). When a visitor left a gate open, the agent followed him home and murdered him. *Ibid.* This "deadly assault" was not, to put it mildly, "a c[u]stomary way" of securing ranch gates. *Ibid.* The second, *Ross v. Marshall*, involved a son who was his father's agent for "wrapping [] up" a bonfire at their home. 426 F.3d 745, 748 (5th Cir. 2005). The son and his friends instead built a large wooden cross and set it ablaze in front of another family's home in "an act of racial terrorism." *Id.* at 765; *see also id.* at 748–50. The son's actions were unforeseeable based on the authority his father had given him. *Ibid.*

Those cases are nothing like this one. Nordlicht defrauded Black Elk's creditors—to the Rechnitzes' benefit—by manipulating the very PPBEO investment the Rechnitzes had authorized him to manage. Accordingly, Nordlicht's knowledge of the transfer's voidability is imputed to the Rechnitzes, and § 550(b)(1) offers them no help.[12]

---

[12] Alternatively, the Trustee argues that § 550(b)(1) would not protect the Rechnitzes even if Nordlicht's knowledge was not imputable to them. He suggests that § 550(b)(1) adopts the common law rule forbidding a principal from retaining the benefit of his agent's fraud "to the injury of an innocent third person," even when that fraud was

No. 23-20386

## C. Tracing

Finally, the Rechnitzes contend the bankruptcy court used a flawed methodology to trace the $10.3 million to Nordlicht's fraud. Tracing is a "tool of equity," *United States v. Boardwalk Motor Sports, Ltd.*, 692 F.3d 378, 384 n.7 (5th Cir. 2012), and we review the tracing analysis for abuse of discretion. *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996) (citing *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993)); *W. Delta Oil*, 66 F. App'x at 524; *see also Bakst v. Wetzel* (*In re Kingsley*), 518 F.3d 874, 877 (11th Cir. 2008) ("Equitable determinations by the Bankruptcy Court are subject to review under an abuse of discretion standard." (quotation omitted)).[13]

"[E]quitable tracing principles . . . are means used by courts in many different areas of law to identify and segregate property that has been mingled with other property in such a manner that it has lost its identity." *United States v. Henshaw*, 388 F.3d 738, 740 (10th Cir. 2004) (quotation omitted); *see also Hill v. Kinzler* (*In re Foster*), 275 F.3d 924, 927 (10th Cir. 2001). "There are several alternative methods, none of which is optimal for all commingling cases; courts exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them." *Henshaw*, 388 F.3d at 741. Courts should use a method that "reflects reality," based "on the precise circumstances" of the "particular case."

---

unauthorized. *Bankers Life*, 447 F.2d at 1006; *see also Rogers v. B & R Dev., Inc.*, 523 S.W.2d 15, 18 (Tex. App.—Fort Worth 1975, no pet.) (deeming principle to have ratified agent's unauthorized fraud by accepting its benefits). Because we conclude that Nordlicht's knowledge is imputable to the Rechnitzes, we need not address that question.

[13] The Rechnitzes argue our review of the tracing methodology is *de novo* because the case arrives here on summary judgment, but they point us to no authority for that proposition. That said, our review of legal issues and the presence of genuine fact disputes is *de novo*, as it is with respect to any summary judgment. *See, e.g.*, *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 425 (5th Cir. 2006).

*United States v. Banco Cafetero Pan.*, 797 F.2d 1154, 1160 (2d Cir. 1986). As an "equitable fiction," a tracing methodology "should not be employed where equity does not warrant the result." *In re Foster*, 275 F.3d at 927.[14]

As noted, the bankruptcy court did not entirely adopt either side's expert tracing report.[15] Using data from the Rechnitzes' report, the court employed a different methodology,[16] focusing on Nordlicht's objective in defrauding Black Elk's creditors: namely, paying investors like the Rechnitzes. *See Landesman*, 17 F.4th at 321–22 (government proved that Nordlicht's scheme "benefitted Platinum investors to the detriment of Black Elk bondholders").[17] The court described its approach as an application of

---

[14] *See also* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 59 (2011) ("The balance from time to time of a commingled fund may be determined by whatever method of accounting is practicable and appropriate to the circumstances of a particular case.").

[15] In a standard case, the jury "determines the quantum of damages." *See Hawkes v. Ayers*, 537 F.2d 836, 837 (5th Cir. 1976). And when competing damages experts provide competent summary judgment evidence to support their respective analyses, the damages issue is normally left to the jury. *See Cox v. Provident Life & Accident Ins. Co.*, 878 F.3d 504, 507 (5th Cir. 2017). Here, however, the bankruptcy court used tracing—a tool of equity— to determine the quantum of funds (not damages) the Trustee may claw back from the Rechnitzes. *See Durham*, 86 F.3d at 72. The battle of the experts in the summary judgment record is therefore not dispositive on the tracing issue.

[16] The Rechnitzes suggest in passing that the district court's failure to adopt an approach advanced by the parties was in and of itself an abuse of discretion. Not so. Although "[e]xpert opinion regarding the appropriate methodology may prove helpful," the ultimate choice is committed to the Court's discretion. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff*), 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017); *see also Durham*, 86 F.3d at 72.

[17] The Rechnitzes claim there is a genuine dispute of fact on this point. We disagree. Not only did numerous emails from Nordlicht and others show his intention to pay PPBEO investors using the Renaissance proceeds, but Nordlicht did in fact pay those investors shortly after the proceeds entered Platinum's accounts. *See Landesman*, 17 F.4th at 321–22. The Rechnitzes suggest that, at a minimum, there is a dispute as to whether they were among the investors Nordlicht intended to pay, because they received their principal

the Lowest Intermediate Balance Rule ("LIBR"). That rule generally "assumes that the funds being traced are used by the account holder only after funds from other sources have been exhausted." *Guffy v. Brown* (*In re Brown Med. Ctr., Inc.*), 2017 WL 8677359, at *3 (S.D. Tex. Aug. 25, 2017); *see also United States v. Jonas*, 824 F. App'x 224, 228 n.2 (5th Cir. 2020). But the court's approach is more accurately described as using the "drugs-in, first-out" rule—better referred to in this context as the "proceeds-in, first-out" rule. *See Banco Cafetero*, 797 F.2d at 1159; *United States v. Sellers*, 848 F. Supp. 73, 74–75 (E.D. La. 1994) (applying *Banco Cafetero* and the "proceeds-in, first out" rule to the government's investigation of alleged fraud-money laundering).[18] The Rechnitzes and the Trustee agree this was the method the bankruptcy court adopted. This approach assumes that, when tainted and untainted funds are commingled, the tainted funds are used *first*. *See Sellers*, 848 F. Supp. at 74–75.

Using data from the Rechnitzes' expert report, the bankruptcy court traced the Renaissance proceeds as they were transferred back and forth between various Platinum accounts and commingled with $7.2 million of untainted funds. Eventually, Nordlicht consolidated most of the tainted funds—$72.9 million—within PPBEO Account 5613. Nordlicht made both

---

payment about two weeks later than most other investors. The Trustee suggests this was only because the Rechnitzes were considering reinvesting in another Platinum fund. Regardless, the Rechnitzes place far more weight on this slight delay than it can bear. For starters, the Rechnitzes received their $267,149.80 interest payment within the same timeframe as most other PPBEO investors. And it is undisputed that Nordlicht orchestrated the scheme to pay PPBEO investors and that he did pay the Rechnitzes in the Renaissance sale's immediate aftermath.

[18] *See also United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013); *United States v. Shah*, 2023 WL 7666091, at *7 (N.D. Ill. Nov. 15, 2023); *United States v. Dillon*, 2022 WL 2105974, at *8 (D. Idaho June 10, 2022); Sean Michael Welsh, *Tracing Commingled Funds in Asset Forfeiture*, 88 Mɪss. L.J. 179, 194, 197–200 (2019) (discussing this methodology in context of asset forfeiture).

payments to the Rechnitzes from that account. Per the bankruptcy court's analysis, when Nordlicht did so, Account 5613 had enough tainted funds to cover those transfers. Accordingly, the bankruptcy court deemed the payments traceable to Nordlicht's fraud.

The Rechnitzes insist this was error. They argue that, by assuming Nordlicht used tainted funds first, the court deviated from LIBR. But, as explained, by assuming tainted funds were transferred before untainted ones, the bankruptcy court applied the "proceeds-in, first-out" rule. *Sellers*, 848 F. Supp. at 74–75; *see also Banco Cafetero*, 797 F.2d at 1159.[19] And that approach "reflects reality" in this case. *Banco Cafetero*, 797 F.2d at 1160. After all, Nordlicht defrauded Black Elk's creditors to pay the Rechnitzes for their investment in PPBEO. And he did pay the Rechnitzes shortly after receiving the Renaissance proceeds. Indeed, under these circumstances, deeming Nordlicht's transfer to the Rechnitzes untraceable to his fraud would elevate "substanceless formalities" over reality. *Boardwalk*, 692 F.3d at 384 n.7; *see also Henshaw*, 388 F.3d at 741 ("[C]ourts exercise case-specific judgment to select the method best suited to achieve a fair and equitable

---

[19] Moreover, as the Trustee points out, other courts have concluded that even LIBR "does not mandate that legitimate funds are always [considered] the first to leave the account." *United States v. Miller*, 295 F. Supp. 3d 690, 705 n.20 (E.D. Va. 2018), *aff'd*, 911 F.3d 229 (4th Cir. 2018). Indeed, when using LIBR, the Fourth Circuit has repeatedly approved the tracing of tainted funds transferred out of a commingled account "through a transaction that took place before legitimate funds were depleted." *Miller*, 911 F.3d at 234 (citing *Sony Corp. of Am. v. Bank One, W. Va., Huntington NA*, 85 F.3d 131, 138–39 (4th Cir. 1996)). This is because "LIBR circumscribes what can be traced *into* an account, rather than *out* of it." *Id.* at 235 (emphasis added); *see also, e.g.*, *Watts v. MTC Dev., LLC* (*In re Palisades at W. Paces Imaging Ctr., LLC*), 501 B.R. 896, 917 (Bankr. N.D. Ga. 2013) (employing LIBR but tracing tainted funds first when it was "clear" under the circumstances that the relevant transaction involved funds that should be considered tainted); *In re A'Hearn*, 2012 WL 1378467, at *6 (Bankr. N.D. Iowa Apr. 19, 2012) (same).

result on the facts before them."). Accordingly, the bankruptcy court's tracing analysis was not an abuse of discretion.

## IV. Conclusion

The district court's judgment is AFFIRMED.